**GOOSE HOLLOW FOOTHILLS LEAGUE, an unincorporated association, et al., Plaintiffs,**

v.

**George ROMNEY, individually and as Secretary of the Department of Housing and Urban Development, et al., Defendants,**

**Portland Student Services, Inc., Intervening Defendant.**

**Civ. No. 71–528.**

United States District Court, D. Oregon.

Sept. 9, 1971.

On Motion for Injunctive Relief Dec. 8, 1971.

---

Charles J. Merten, Marmaduke, Aschenbrenner, Merten & Saltveit, Portland, Or., for plaintiffs.

Sidney I. Lezak, U. S. Atty., Jack G. Collins, First Asst. U. S. Atty., Portland, Or., for defendants.

Gerson F. Goldsmith, Goldsmith, Siegel & Engel, Portland, Or., for intervening defendants.

## OPINION

ALFRED T. GOODWIN, District Judge:

Portland Student Services, Inc. (PSS), received a loan from the Department of Housing and Urban Development (HUD) for approximately $3,193,000 to build a 221-unit, 16-story high-rise apartment building in the Goose Hollow area of Portland.

On March 29, 1971, HUD advanced PSS $1,190,940. Construction had begun when plaintiffs brought this action against HUD and its Regional Administrator, alleging that because these de-

fendants had failed to file an environmental-impact statement as required by the National Environmental Policy Act of 1969 (NEPA) § 102(2) (C), 42 U.S.C. § 4332(2) (C), the disbursal of federal money was illegal.

The National Environmental Policy Act took effect January 1, 1970. It requires that all federal agencies "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action * * *." 42 U.S.C. § 4332(2) (C). The statement must indicate the existence of any adverse environmental effects which cannot be avoided, as well as the alternatives to the proposed project.

Treating the proposed high-rise as a "major" project for purposes of Section 102(2) (C), defendants asked the borrower (PSS) to prepare a preliminary environmental worksheet. This worksheet was submitted to HUD on March 26, 1971. Three days later, the defendants filed a "negative statement," indicating that no environmental-impact statement was necessary.

■ The Act does not require an environmental-impact statement in every case in which a federal agency plans or finances a project. Echo Park Residents Comm. v. Romney (C.D.Cal. May 11, 1971). Statements are required by the Act if the proposed project is "major" and if it will have a "significant effect" upon the quality of the human environment.

Since HUD concedes that the PSS project is a "major" undertaking, the only question here is whether HUD acted arbitrarily in determining that the project would not have a "significant effect" upon the quality of the human environment.

In April 1970, the Council on Environmental Quality, established by Title II

of NEPA, published its interim guidelines. These guidelines became final without important alteration in April of 1971. The interim guidelines were intended to govern HUD's environmental decisions at the time the PSS loan was approved in March 1971.

In Section 5(b), the guidelines say:

"The statutory clause 'major Federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view to the overall, cumulative impact of the action proposed * * *." 35 Fed.Reg. 7390, 7391 (1970).

The guidelines note further that "[p]roposed actions the environmental impact of which is likely to be highly controversial should be covered in all cases * * *." 35 Fed.Reg. at 7391.

From the plan's inception, opponents of the project began petitioning local and federal agencies in the hope of convincing them that the building's construction would be a hazard to the environment. The controversy has now manifested itself in this action.

■ The defendants now claim that the project will benefit rather than degrade the surrounding environment. But, as the interim guidelines point out, in Section 5(c), such a claim, even if true, does not mean that the project will not have a significant impact upon the quality of the human environment in and around Goose Hollow. Because the area presently has no high-rise buildings, the new building will undoubtedly change the character of the neighborhood. By housing a significant number of students, it will concentrate population in the area and serve to draw a greater concentration in the future.

The defendants gave virtually no weight to these factors, or to the incidental increase in automobile traffic. Neither did the defendants indicate that any weight was given to the loss of the existing view from certain neighboring properties. I believe the defendants have ignored cumulative effects on the

quality of the human environment which are by no means insignificant.

This court recognizes the infirmity of the phrase, "significantly affect the quality of the human environment." Legislative direction couched in such terms can hardly be expected to produce clarity, decisiveness, or predictability in administrative decisions. But in the present case, the agency charged with environmental responsibility appears to have done virtually nothing except to take the promoter's worksheet at face value and endorse it without independent investigation.

■■ An agency's statement that it need not file an environmental-impact statement is not the statement the statute demands. Furthermore, as the Court of Appeals for the District of Columbia has recently observed, the only agency which is in a position to carry out a complete Section 102(2) (C) environmental study is the agency "with overall responsibility for the proposed federal action." Calvert Cliffs Coordinating Comm. v. United States A. E. C., 449 F.2d 1109 (D.C.Cir. 1971). In the instant case, that agency was HUD and not PSS.

The Goose Hollow project is already well under way. Construction is from 14% to 17% completed. It would be inequitable to punish PSS severely for HUD's error in this, its first attempt in this district to administer the provisions of NEPA. Therefore, a preliminary injunction will issue against HUD and its agents, but will be stayed for ninety days in order to afford HUD an opportunity to prepare and file its environmental-impact statement. I do not believe that the Goose Hollow environment will be irreparably damaged during the period of this stay.

On Motion for Injunctive Relief

This cause came on for hearing on September 2, 1971, on plaintiff's motion for injunctive relief pending final resolution of the action. Plaintiffs were represented by Charles J. Merten; defendants were represented by Jack Collins, First Assistant United States Attorney; and the intervening defendant was represented by Gerson F. Goldsmith.

On September 9, 1971, the court rendered a written opinion, which opinion shall serve as findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Based upon said findings and conclusions,

It is ordered that the defendants George Romney, acting as Secretary of the Department of Housing and Urban Development, Oscar Pederson, acting as Regional Administrator for Region X, Russell Dawson, acting as Area Director for the Portland, Oregon, office, and the Department of Housing and Urban Development, their agents, employees, attorneys and all those in active concert with them, are restrained from disbursing federal funds, reserving federal funds, promising to disburse federal funds, or otherwise committing federal funds to Portland Student Services, Inc., for use for the Goose Hollow student high-rise project. This injunction shall remain in effect until further order of the court. When the defendants have filed a sufficient NEPA statement as required by the National Environmental Policy Act, 42 U.S.C. § 4332(2) (C), they may apply for relief from the injunction.

It is further ordered that all questions of costs and bonds to secure the same or to secure the defendants against loss will be reserved until the final order in this case.